## IN RE MARIAH P. ET AL.*

Superior Court, Judicial District of Danbury, Juvenile Matters

Memorandum filed September 18, 2007[1]

*Scott B. Chamberlain*, for the respondent father.

*Susmita M. Mansukhani*, assistant attorney general, for the petitioner.

---

* Thus titled in accordance with the spirit and intent of General Statutes § 46b-124 and Practice Book § 32a-7.

[1] Affirmed. *In re Mariah P.*, 109 Conn. App. 53, 949 A.2d 1292, cert. denied, 289 Conn. 946, 959 A.2d 1012 (2008).

*Robert W. Shaver II*, for the minor children.

*Michele Murphy*, guardian ad litem for the minor children.

DOOLEY, J. This matter is a proceeding initiated by the petitioner, the commissioner of children and families, seeking to terminate the parental rights of the respondent mother and the respondent father regarding their minor children. Consolidated with these proceedings were permanency plans with respect to each child as formulated by the department of children and families (department). The permanency plans, filed in January, 2007, identified a plan of termination of parental rights and adoption. The parents objected, and the matters were consolidated following the filing of the termination petitions.

The court finds that notice of this proceeding has been provided in accordance with the provisions of the rules of practice. The court further finds that the Superior Court for Juvenile Matters at Danbury has jurisdiction over the pending matter and that no action is pending in any other court affecting custody of the children.

"The termination of parental rights is defined as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his [or her] parent . . . [and as such, it] is a most serious and sensitive judicial action. (Internal quotation marks omitted.)" *In re Jonathan M.*, 255 Conn. 208, 231, 764 A.2d 739 (2001), quoting *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 640, 436 A.2d 290 (1980); see also *In re Bruce R.*, 234 Conn. 194, 200, 662 A.2d 107 (1995). Indeed, the court's task has been identified as not only vital but herculean when the right of a child to be protected and placed in a nurturing environment conflicts with a parent's right to raise a

child without undue government interference. See *In re Shaiesha O.*, 93 Conn. App. 42, 43, 887 A.2d 415 (2006).

These proceedings are governed by General Statutes § 17a-112.[2] In a proceeding for termination of parental rights, the petitioner must prove a ground alleged in the petition, as of the date of filing the petition or the last amendment, by clear and convincing evidence. *In re Joshua Z.*, 26 Conn. App. 58, 63, 597 A.2d 842, cert. denied, 221 Conn. 901, 600 A.2d 1028 (1991); *In re Theresa S.*, 196 Conn. 18, 29, 491 A.2d 355 (1985); Practice Book §§ 32a-3 (b) and 35a-7. However, "[i]n the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the *degree of rehabilitation* is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis in original.) *In re Stanley D.*, 61 Conn. App. 224, 230, 763 A.2d 83 (2000).

If a ground for termination is proven, the court must next consider, in the dispositional stage, whether the facts, as of the last day of trial, establish by clear and convincing evidence that termination is in the child's best interest. As is permitted under our law, in this matter, the evidence as to both the adjudicatory and dispositional phases was heard at the same trial. See Practice Book § 35a-7 (b); see also *In re Eden F.*, 250 Conn. 674, 688–89, 741 A.2d 873, reargument denied, 251 Conn. 924, 742 A.2d 364 (1999); *In re Juvenile Appeal (84-BC)*, 194 Conn. 252, 258, 479 A.2d 1204 (1984).

# I

## PROCEDURAL HISTORY

The respondents have five children: E, L, M, S and T. The children resided with their parents until January

---

[2] The permanency plan hearing is governed by General Statutes § 46b-129 et seq. The petitioner must prove, by a fair preponderance of the evidence, that the plan is in the best interest of the child.

or February, 2006, at which time they were residing with relatives. In April, 2006, an ex parte order of temporary custody was issued, and the children were placed in the custody of the petitioner. At that time and since that date, the children were and have been residing with relatives. E, L and M reside with their maternal grandparents, who have since become licensed relative foster parents. S and T reside with J, a paternal cousin who has also become a licensed relative foster parent. Both placements are considered "preadoptive" by the petitioner.

The order of temporary custody was sustained by agreement on April 12, 2006, at which time both parents signed an order for "specific steps" designed to facilitate reunification of this family. Thereafter, on June 13, 2006, all five children were adjudicated neglected and committed to the petitioner when, on that date, both parents failed to appear in court, were defaulted and the court proceeded in their absence. The determination of neglect was made in light of both parents' ongoing involvement with the criminal justice system as well as unaddressed and significant substance abuse issues by the parents.

On March 2, 2007, the petitioner filed a petition seeking to terminate the parental rights of both parents as to all five children. The matter was tried to the court over the course of several days. Witnesses for the petitioner included social worker Lauren A. Tannone, social worker Noalee Darragh, several police officers from the Danbury police department, Mary McBride from the Midwestern Connecticut Council on Alcoholism, Inc. (alcoholism council), Gerson Ossers from the Connecticut Counseling Center, J, the maternal grandmother, A, and the guardian ad litem for E and L, Michele Murphy. The petitioner also offered a number of exhibits that have been reviewed. The respondent father called Dennis Collins, a family friend, and Loretta Fulcher from

the department of correction, and the father also testified. The respondent mother testified.

The children's attorney did not call any witnesses.

## II

## FACTUAL FINDINGS

The court, based on its review of the testimony and evidence, makes the factual findings set forth as follows by clear and convincing evidence.

## A

## The Parties

The mother is thirty-three years old and is the oldest of four siblings born to A and R. She married the respondent father approximately ten years ago. The mother and father have known each other since high school. The father described it as "love at first sight" when they met at the department of motor vehicles as both were getting their driver's licenses.

The mother gave birth to twins, L and E, on April 30, 1994. M was born three years later on November 18, 1997. S was born on September 20, 2001, and T was born on August 13, 2004. The mother worked outside the home prior to the children being born. She reports having been in the graphic communications field and both successfully and gainfully employed. After the twins were born, she stayed at home and did not work outside the home. The family was supported by the father. The family lived in a single-family residence that was owned by the mother and father at the time of the removal. Reports of family members include assessments that prior to her involvement with drugs, the mother was a very good and devoted mother to her children. The mother shares this opinion and described in detail the type of mother she was to her children

as well as the many activities that both she and the children enjoyed.

The mother was introduced to heroin by the father (and subsequently abused other drugs as well) at a date that is impossible to pin down but likely no later than early 2005. By the fall of 2005, relatives were growing very concerned about the family, though they were not fully aware of the depth of the issues. The mother's efforts at addressing these issues will be discussed.

The father is thirty-three years old and a high school graduate. He was licensed as a plumber and used to provide well for his family. He made more than enough money to support his family and meet their needs. He is described as having been a "wonderful guy and good provider" until he became involved with drugs. From the testimony of J, it appears that his family hopes he will return to the person he once was, but at present, family relations are strained.

The father's downturn is attributed to a confluence of events. When L was five, she became critically ill and was diagnosed with ulcerative colitis. While the family was dealing with these issues, in 2002, the father's brother died of cancer. He described this event as one that "crushed him." He described himself as sad and increasingly unable to go to work. J stated that the father changed after the death of his brother. The father acknowledges that the combination of the stresses in his life led him to start using drugs, primarily heroin, and so the spiral down began. The father's efforts to address these issues will be discussed.

E was born April 30, 1994, and is currently thirteen years old. She is placed with her maternal grandparents along with L and M. She is described as smart with an outgoing personality. At the time of the removal, E was described as "parentified." She had assumed responsibility for the younger siblings and was well aware of

her parents' drug use and problems. Following the removal, E disclosed that she and L had devised plans in the event that drug dealers came into their home. Of primary concern in these plans was getting the younger children out of the house unharmed if the drug dealers came. She has indicated that she knows her parents are addicts and cannot take care of her and her siblings. While she is angry about this, she is grateful to and loves her grandparents. She understands that she would be in foster care if she could not be with them. She reportedly told her grandmother that following the removal, she no longer had to worry about when and what her next meal would be, about taking care of the little ones or about the drug dealers breaking into the house and having to escape with the children.

E attends middle school. Through the school, she also attends individual counseling sessions as well as a support group. E's adjustment to placement and her feelings regarding these petitions will be addressed.

L was also born April 30, 1994, and is currently thirteen years old. She, too, is described as smart, with an outgoing personality. L is considered medically complex. She is diagnosed with ulcerative colitis and must use a colostomy bag. Since her placement, she has undergone a number of procedures and surgeries in an effort to reverse the situation, thereby eliminating the need for a colostomy bag. At the time of trial, she was hospitalized, as some of the procedures and surgeries had just occurred. L has also exhibited several other medical issues. She had surgery in the fall of 2006 during which her adenoids and tonsils were removed and a tube inserted in her ears. She has suffered some hearing loss as well. Although it was the goal of the most recent surgeries to improve L's quality of life, she will continue to have medical issues and will need further extensive surgery in the future. Though not completely clear, it

does not appear that the most recent surgery was as successful as anyone might have hoped.

L is described as "parentified" but to a lesser extent than her sister, E. She echoed her sister's report of their difficult and sometimes scary life before the removal. She told her grandmother of at least one incident of physical abuse that she endured at the hands of her mother and father. L is in counseling to assist her with many of these issues and appears to be making progress. L's adjustment to placement and her feelings regarding these petitions will be addressed.

M was born November 18, 1997, and is nine years old. She is the middle child, though the youngest placed with the maternal grandparents. She is described by a department social worker as soft-spoken. She has completed fourth grade and is reported to be "almost a straight A student." She enjoys her friends, music, movies and art and crafts. She does not have any ongoing medical issues. M's adjustment to placement and her feelings regarding these petitions will be addressed.

S was born September 20, 2001, and is soon to be six years old. She is described by her department social worker as "tall for her age," "friendly," "exuberant" and well liked by her teachers and classmates. S is placed with her paternal cousin, J. She recently completed kindergarten and will start first grade this year. S has had some "speech problems" that may have come about by the prolonged use of a pacifier. S still used a pacifier when she was placed in the petitioner's custody. At that time, she was approximately four and one-half years old. She participates in speech therapy and has reportedly made great progress. Otherwise, S has no medical issues. S's adjustment to placement will be addressed.

T was born August 13, 2004, and is three years old. T is also placed with her paternal cousin, J. He is described as having been "lethargic" and inactive upon

placement. He is now described as "full of energy," which his foster mother attributes to increased stimulation at day care and in her home. He attends day care and is healthy. At the time of his placement, he exhibited numerous and recurring illnesses, including ear infections, a cough, a runny nose and allergy problems. He is currently monitored by an ear, nose and throat doctor. He continues to achieve developmental milestones. Although the department's social study indicates that he has "begun to catch up developmentally," the testimony at trial was that a referral to the Birth to Three program was made and that it was determined that he was not in need of any services. From this, the court concludes that he did not need to "catch up," as he was apparently within normal ranges in his development of various skills. T's adjustment to placement will be discussed.

## B

### The Specific Steps

Both respondents signed an order for specific steps, in connection with which the department offered various case management services.

### 1

### Visitation

The specific steps required that the parents visit the children as often as the department permits. From April through June, 2006, the mother had visitation with all five children at the maternal grandmother's home approximately three times per week. The maternal grandmother did not want to supervise visits involving the respondent father, so he was not offered this visitation though there was some evidence that he attended one or perhaps more of these visits with the respondent mother. He was, however, offered weekly visitation at the department's office with his children. Between April

and June, 2006, the father did not request any visitation, nor was any arranged for him to see his children.

In June, 2006, at the request of the maternal grandmother, visits at her home were reduced to one time per week—Sunday. An additional day per week of visitation was scheduled at the department's office. Both the mother and father attended the visitation at the department's office. The Sunday visitation was with the mother only. This visitation schedule continued into the autumn of 2006.

In October and November, 2006, approximately four of the scheduled visits did not occur. Indeed, there was only one visit in November. On two occasions, the five children were brought to the department's office, but the parents did not show up or call to cancel. On one occasion, the mother canceled in advance, as both the mother and father were involved in preparing for the father's upcoming criminal trial. On another occasion, the visit was canceled, as both the mother and father had been arrested and were unavailable.

The father has been incarcerated since November 16, 2006. He did not request visits, nor did visits occur at his place of incarceration until March, 2007. Since then, visits have occurred on a monthly basis.

The mother had only one visit in November and one visit in December, on December 14, 2006. At the conclusion of that visit, she left without saying goodbye to the children. Although the children were brought to a visit the week before Christmas, the mother did not show up. This event was described as very traumatic for S, who had a Christmas present for her mother and was very sad that her mother did not show up so that she could give her the present. The mother did not request or call for any further visits until March, 2007, when the mother was incarcerated and the children were brought to the facility at which she was being

held. The mother was incarcerated in approximately February, 2007. The mother's visits, while incarcerated, have been monthly since March, 2007.

The foster families have continued to permit ongoing telephone contact between the children and the parents during the period of incarceration.

2

Counseling

The specific steps signed by the mother and father also include a requirement that they participate in individual and parenting counseling. In this vein, the department referred the mother and father to various treatment providers in their area. The department provided the names of organizations as well as their telephone numbers so that the mother and father could easily access these services.

There is no evidence that the mother or father ever contacted any of these service providers or engaged in any individual therapy or parenting classes. The department sent reminder letters regarding the content of the specific steps to both the mother and father on July 25 and November 3, 2006. Each of these correspondence again included the organization to which the parents were being referred for parenting classes, the name of the person to contact at that organization and the telephone number. Each correspondence reiterated a referral to the alcoholism council for substance abuse counseling. Each correspondence included a referral to a choice of organizations for individual counseling, again including the telephone number so as to facilitate contact.

Finally, the July, 2006, and November, 2006 correspondence advises quite clearly that failure to comply with the previously ordered specific steps will "hinder reunification" and may result in a concurrent plan of

transferring guardianship of the children to their current relative placements.

On January 4, 2007, the department sent yet another letter to the respondent mother regarding her obligations under the specific steps. By this time, the father was incarcerated and had been since November 16, 2006. In the January 4, 2007 letter, the same referrals are made. Of note, this correspondence advises the mother that the department will seek a termination of her parental rights if the steps are not satisfied.

Notwithstanding these reminders and referrals, neither the mother nor the father ever followed through by contacting any service providers, ever received parenting classes or education or ever engaged in individual therapy prior to being incarcerated.

3

Substance Abuse Evaluation and Treatment

The specific steps for the mother and father included the following: (1) no substance abuse; (2) substance abuse assessment and treatment; and (3) random drug testing. Both the mother and father have a history of substance abuse as well as drug related arrests. Indeed, at the time of the order of temporary custody, the mother was involved with the Connecticut Counseling Center and was engaged in its methadone maintenance program.

a

Father

With respect to the father, the evidence established that he complied with this requirement insofar as he went to the alcoholism council for an assessment and drug screen on October 13, 2006. However, this was the third referral made by the department. The first

intake appointment was rescheduled. The second refer-
ral resulted in a "no show" by the father. He did appear
and participate in an intake assessment the third time.
The drug screen was negative for all illicit substances
and, upon completion of the father's assessment, he
was recommended for relapse prevention counseling
for a minimum of twelve weeks.

The assessment includes a self-report by the father
of a history of drug abuse dating back to when he was
thirteen years old when he reportedly smoked mari-
juana frequently. He reported the use of cocaine and
crack cocaine beginning in his early to mid-twenties
continuing to early 2006. He reported heroin use for a
period of time, on a daily basis, to April, 2006. He also
reported one overdose of heroin and prior treatment
efforts, including a period of detoxification and
methadone.[3]

He testified that methadone helped him use less her-
oin, but it did not prevent him from continuing to use
illicit substances, including heroin.

Notwithstanding this substantial and lengthy history
of drug abuse, the father failed to follow through with
any relapse prevention counseling as recommended
prior to his period of incarceration. Because he did not
engage in relapse prevention, he was not subject to any
further random drug screens. Additionally, because he
did not go to the alcoholism council for approximately
six months following the entry of the specific steps,
there is no evidence that he abstained from drug use
during that period of time. However, he was arrested on
drug related charges following the alcoholism council's
assessment, and he testified that he was using heroin
until his incarceration in November, 2006.

Following his incarceration, in May, 2007, the father
signed up for the tier II "Living in Balance" program,

---

[3] His self-report was not entirely accurate, as the court will discuss.

designed to "provide a foundation for recovery from harmful chemical and behavioral addictions." He was accepted into the program, was interviewed on July 19, 2007, for intake and began the program shortly thereafter. At the time of trial, he had attended six or seven sessions of the planned thirty session program.

b

Mother

With respect to the mother, the evidence established that at the time the specific steps were issued, the mother was already engaged in substance abuse treatment at the Connecticut Counseling Center. She was on a methadone maintenance program and was receiving counseling. As required, she provided a release to the department so that it could ensure her ongoing compliance with the treatment plan. Unfortunately, the mother was unsuccessfully discharged from the program in July, 2006. She missed a number of her group counseling sessions and consistently tested positive for illicit substances. She was referred for inpatient treatment at Connecticut Valley Hospital in Middletown. The mother and the department discussed this referral, and the mother was advised that she needed to apply to the department of social services for insurance. The mother thereafter told her department social worker that she was on the waiting list for Connecticut Valley Hospital and was making the obligatory daily telephone calls to check her status. However, she also advised the department that her insurance was denied because she owned her home. Thereafter, a department social worker called the department of social services and was advised that the insurance request had been denied because all of the necessary paperwork had not been completed by the mother, not because the mother owned a home.

Thereafter, the mother continued to have positive urine screens on both September 18 and October 13, 2006. On October 13, 2006, she underwent an intake assessment at the alcoholism council. During that process, she disclosed a history of drug use that dated back to her teen years. However, she disclosed that her use of cocaine, crack cocaine and heroin had begun in earnest in early 2006. Her self-report is of limited utility, however, as she also reported that her last use was in June, 2006. This claim is belied by the results of the drug screens taken in September, 2006, and October, 2006, and her testimony in which she acknowledged using heroin until her incarceration in February, 2007. In any event, following the intake, the mother was recommended for an intensive outpatient program by the alcoholism council. She never followed through on this recommendation. Indeed, the mother has been referred to the alcoholism council on numerous occasions and has failed to follow through with her scheduled appointments.

The mother's involvement with drugs is also manifest by the series of police reports entered into evidence. On February 27, 2006, shortly after midnight, the Danbury police department, in response to an anonymous call, went to the Sheraton Hotel to do a welfare check on two children, reportedly in the company of the mother and father. J confirmed that she made the telephone call to the police. She was very concerned about S and T, having seen the mother earlier that evening when she went to pick up the twins, E and L, and bring them to her home.

When the police arrived at the hotel, the mother was alone in the hotel room with S and T. S was awake and T was sleeping. Inside the hotel room, the police located a spoon with residue, needles, lighters, a syringe and two crack pipes. At that time, the mother showed the police her "track marks" and admitted to the police

that she has a drug problem but that she was getting help for it. The track marks were described as not being fresh. The police seized the paraphernalia but did not arrest the mother that evening. However, the incident was reported to the department.

The mother was arrested again in April, 2006 (the event that immediately preceded the order of temporary custody), on drug related charges. According to the police incident report, paraphernalia used for smoking, needles, crack cocaine and heroin were all recovered from the vehicle in which the mother and father were driving. Thereafter (after the mother had been unsuccessfully discharged from the Connecticut Counseling Center), on October 23, 2006, the mother was again arrested on narcotics charges after heroin, cocaine, prescription pills and a scale were found in the vehicle in which she and the father were riding.

Between October, 2006, and her incarceration in February, 2007, the mother did not seek treatment, comply with referrals or submit to drug testing. She has been incarcerated since February, 2007, when she was arrested on a failure to appear warrant that was issued following a missed court date stemming from the drug charges brought on October 23, 2006.

Finally, the mother candidly admitted to using heroin following her last visit with her children in December, 2006, until her incarceration in February, 2007. Indeed, it was the depth of the addiction during this time period to which she attributes her failure to visit her children.

Since her incarceration, the mother has taken steps to address her addiction. She applied for an addiction recovery program on April 30, 2007. She began the Community Health Center's stress reduction program in mid-May, 2007. She attends Narcotics Anonymous or Alcoholics Anonymous meetings and parenting classes.

## 4

## Involvement with the Criminal Justice System

The specific steps also required that both the mother and father have no further involvement with the criminal justice system. At the time, the father had the following pending charges: (1) narcotics related charges from October, 2005; (2) narcotics and weapons charges from February, 2006; and (3) narcotics related charges from April, 2006. The mother had pending charges from the same incident in April, 2006, as well as a pending case for possession of drug paraphernalia from September, 2005.

### a

### Father

Since the signing of the specific steps, the father has been arrested two additional times.

Although no documentation was placed in evidence, the department's social study reflects that the father was arrested in New York on October 18, 2006, and was charged with driving while intoxicated and operating without a license, as well as with narcotics related charges. He acknowledged this arrest and testified that he does not know the status of those charges.

The father was arrested again on October 23, 2006, and charged with various narcotics offenses. On that date, the father was the subject of a motor vehicle stop and was arrested for operating a motor vehicle while his license was under suspension. A subsequent search of the vehicle revealed heroin, cocaine residue on a scale and prescription pills—Ativan. He was charged with various narcotics charges.

The vast majority of the father's criminal matters, including those pending at the time of the order of temporary custody, were resolved on January 17, 2007.

The father was convicted on weapons charges following a jury trial on November 16, 2006. These charges arose out of the February, 2006 arrest. Upon entry of the verdict, he was incarcerated pending sentencing. He was sentenced on the weapons charges and also resolved other pending matters on January 17, 2007. He was given five year sentences on each of the gun charges to run consecutive to each other for a total effective sentence of ten years. He received a three year sentence on a narcotics charge stemming from the October 23, 2006 arrest. This sentence was to run consecutive to a seven year sentence imposed on a narcotics charge stemming from the April, 2006 arrest. The sentence for the October and April offenses, though consecutive to each other, runs concurrent to the sentence on the weapons charges. It appears that the total effective sentence for all matters entered on January 17, 2007, is ten years incarceration. The father's maximum release date is in December, 2016.

The father testified that he is doing "50 percent" time and that he is hopeful of being released as early as 2011.

b

Mother

The mother was arrested three times following the signing of the specific steps. She was arrested with her husband on October 23, 2006, the details of which appear previously. She was also arrested in New York in November, 2006, and charged with driving while intoxicated, various drug related charges and false impersonation. (The status of these charges is unknown.) Finally, she was arrested in February, 2007, for failure to appear as a result of a missed court appearance stemming from the October 23, 2006 arrest.

The mother resolved the drug paraphernalia charge from 2005 that was pending at the time of the order of

temporary custody. She was convicted and paid a fine. She resolved the other pending matters (from Connecticut) during the time of this trial. She was convicted of possession of narcotics with intent to sell and was sentenced to five years imprisonment, execution suspended after two years. She believes that she will be imminently eligible for release to a halfway house, though she acknowledged that the pending matter in New York is an "unknown" in terms of its impact on that eligibility. She advised that no "detainer" had been lodged. Unfortunately, at the time of trial, her counselor was still tracking down the status of the New York charges. Thus, whether she will be released soon to a halfway house or not, whether she will be extradited to New York or otherwise have to address those legal issues upon her release is unknown. If she were to serve the two year sentence, she would face a maximum release date perhaps as late as early 2009.

5

## Maintain Legal Income and Stable Housing

The specific steps also required the mother and father to maintain stable and adequate housing as well as legal employment. Unfortunately, although the mother and father owned their home at the time of the order of temporary custody, they were not, thereafter, able to keep making the mortgage payments, and a foreclosure action was commenced. On the issue of legal income, the department had no evidence that either the mother or father were legally and gainfully employed between April, 2006, and their respective incarcerations.

6

## Keep All Appointments Set by or With the Department

The specific steps also required the parents to attend appointments at the department or elsewhere as may

be required. In that vein, the department conducts treatment plan conferences and administrative case reviews on a periodic basis. Parents, among others, are notified of these meetings and are expected to attend. Neither the mother nor the father attended any of the treatment plan conferences or the administrative case review for these children. The court notes that some of these events may have occurred while either the mother or father (or both) were incarcerated. In the event of a parent's incarceration, however, the department will assist in coordinating the parent's participation via telephone conference if requested to do so. The mother provided evidence that she attempted to attend via teleconference but was thwarted by the correctional facility. The father never requested to attend via teleconference. Other missed appointments, i.e., substance abuse assessments or visits with the children, are discussed elsewhere in this opinion.

7

## Other Miscellaneous Steps

The specific steps included various other obligations, which, in this case, were either inapplicable or were complied with by both the mother and father. For example, the steps required cooperation with "in-home" services. Here, as the children were never reunited with their parents, no in-home services were offered. The steps required the signing of releases by the parents. Both parents were compliant with the step. The steps required the parents to keep the department advised as to their whereabouts. Both parents were compliant with this step. The steps required cooperation with court-ordered evaluations. No such evaluations were ordered, and so this step was inapplicable.

III

## ADJUDICATION

The grounds alleged in the petition as to the respondents, the mother and father, are that the children were

found in a prior proceeding to have been neglected or uncared for and that the parents failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the ages and the needs of the children, the parents could assume a responsible position in the lives of the children. General Statutes § 17a-112 (j) (3) (B) (i).

A

Location and Reunification
General Statutes § 17a-112 (j) (1)

In order to terminate parental rights, the petitioner must prove, by clear and convincing evidence, the statutory element requiring "reasonable efforts to locate the parent and to reunify the child with the parent . . . unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing . . . that such efforts are not required . . . ." General Statutes § 17a-112 (j) (1). "Although [n]either the word reasonable nor the word efforts is . . . defined by our legislature or by the federal act from which the requirement was drawn . . . [r]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re Mariah S.*, 61 Conn. App. 248, 255, 763 A.2d 71 (2000), cert. denied, 255 Conn. 934, 767 A.2d 104 (2001). In *In re Shaiesha O.*, supra, 93 Conn. App. 48, the Appellate Court found that the trial court must look to events prior to the date the petition was filed to determine whether reasonable efforts at reunification were made. Here, these petitions were filed March 2, 2007.

In this matter, the court finds by clear and convincing evidence that the department made reasonable efforts to reunify this family.

The department made numerous, specific and repeated referrals to various service providers. The department provided the names and contact information for counseling and parenting classes. The department made significant efforts to get the mother and father to engage in substance abuse counseling. Repeated referrals were made to the alcoholism council. Finally, in October, 2006, the mother and father appeared for their intake assessments. The mother tested positive and thereafter did not participate in any recommended treatment. Indeed, she failed to show for several additional appointments set by or with the assistance of the department. The father, though not testing positive, failed to follow through with any recommended treatment prior to his incarceration.

The department offered visitation beginning in April, 2006. The father did not seek or have any visitation until June, 2006. The mother was consistent at first but by the fall of 2006, both she and the father became inconsistent and sporadic in those efforts.

In sum, the department did all that was reasonably necessary to try to reunite this family. That those efforts did not succeed was the result of the mother's and father's utter complacency in the lifestyle they had chosen, one of drug use and criminal involvement.

B

Parental Failure to Rehabilitate
General Statutes § 17a-112 (j) (3) (B) (i)

The petitioner alleges that the respondents' parental rights should be terminated because they have failed to achieve rehabilitation within the meaning of § 17a-112 (j) (3) (B). All five children were found to be neglected on June 13, 2006. The so-called adjudicatory date for these petitions is March 2, 2007.

The factual determination for this court is whether the respondents have achieved rehabilitation as contemplated under § 17a-112 (j) (3) (B), that is, rehabilitation sufficient to render them able to care for their children.

"Personal rehabilitation as used in [§ 17a-112] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [The statute] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Citations omitted; internal quotation marks omitted.) *In re Eden F.*, supra, 250 Conn. 706; *In re Amneris P.*, 66 Conn. App. 377, 384–85, 784 A.2d 457 (2001).

In assessing rehabilitation, the critical issue is not whether the parent has improved his or her ability to manage his or her life, but rather whether he or she has gained the ability to care for the particular needs of the child at issue. *In re Amneris P.*, supra, 66 Conn. App. 385. Expressing love for a child and visiting with a child occasionally is vastly different from being able to care for the particular needs of a child on a day-to-day basis, even with supports in place. "Terminating a parent's rights is not ordered to punish a parent who has not tried to rehabilitate; it is ordered so as not to punish a child by denying her a safe permanent home with proven competent caretakers because her biological mother has tried hard but continues to be incapable of providing such a home for her." *In re Samantha B.*, 45 Conn. Sup. 468, 477, 722 A.2d 300 (1997), aff'd, 51

Conn. App. 376, 721 A.2d 1255 (1998), cert. denied, 248 Conn. 902, 732 A.2d 177 (1999).

In assessing rehabilitative progress, the question is not simply how far has the parent come, but has he or she come far enough to encourage the belief that within a reasonable period of time, the parent can assume his or her role as parent in the life of the child. *In re Stanley D.*, supra, 61 Conn. App. 230; see also *In re Sheila J.*, 62 Conn. App. 470, 480, 771 A.2d 244 (2001). "What constitutes a reasonable time is a factual determination that must be made on a case-by-case basis." *In re Stanley D.*, supra, 231, citing *In re Michael L.*, 56 Conn. App. 688, 694, 745 A.2d 847 (2000).

With these standards as the court's parameters, the court finds by clear and convincing evidence that neither the mother nor the father has achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, either will be in a position to resume parenting responsibilities for these children. See *In re Daniel C.*, 63 Conn. App. 339, 354, 776 A.2d 487 (2001); *In re Ashley S.*, 61 Conn. App. 658, 665–66, 769 A.2d 718, cert. denied, 255 Conn. 950, 769 A.2d 61 (2001); *In re Sarah Ann K.*, 57 Conn. App. 441, 449–50, 749 A.2d 77 (2000).

With respect to the father, the court notes at the outset that he will likely be incarcerated until at least 2011 and may well be incarcerated until 2016. Regardless of the degree to which he might have and continues to take advantage of the various rehabilitative programs available within the department of correction, his ten year sentence makes it impossible for him to resume care and parenting of his children within a reasonable period of time. Having noted that, however, the father's conduct prior to his incarceration, and to a certain

degree after,[4] gives little hope of any rehabilitative success on the father's part. He did absolutely nothing to improve the situation or to address the issues that plagued his family. He never resumed gainful employment as a plumber or in any other capacity. He never went for individual counseling, he never took any parenting classes, he didn't follow through with any substance abuse counseling and he did not even manage to cease further involvement with the criminal justice system. Although it does not appear that he made *any* efforts in this regard, it is quite clear that any efforts that might have been made were an abysmal failure.

In response, the father testified that since becoming incarcerated, he has committed to remaining drug free, he intends to resume life as a licensed plumber and he could never go back because to do so would be to let his children down "again." He has, in his words, "lost everything," and he wants it all back. Although this court does not doubt the sincerity of his intentions or his love for his children, the measure of his intentions will not be made for at least four years and likely much longer. The court cannot leave these children in legal limbo for the extended period of time that would be required to find out if he can make good on his promises.

With respect to the mother, her successes are even fewer. She, too, eschewed any referral or assistance with individual counseling, parenting classes or substance abuse counseling. The mother was well aware of her drug addiction and was repeatedly reminded of its impact on her family. She continued the downward spiral even after having the department remove her children from her care. She was arrested time and time again. Yet, she never once took any assistance or referral from the department or made any effort to bring

---

[4] The father did not seek participation in any programs until the eve of this trial, May, 2007, almost six months after he became incarcerated.

about positive change. As her drug use continued, her legal problems mounted. Yet, she did nothing. Her visitation became sporadic until it simply ended without explanation in December, 2006. Her complete disregard for the steps (and by extension her children) finally manifested itself in her ongoing incarceration—held on a significant bond because of a failure to appear charge. In short, the mother is a terribly great distance, in time and substantive change, from being able to care for her children. Indeed, the court is left with little substantive evidence that she will ever be in such a position. She has not worked outside the home in more than twelve years, it does not appear that she has a home or a way to maintain a home, she still has significant substance abuse issues that need addressing and there is only her testimony for evidence that she is motivated to do so.

The mother's testimony was unequivocal on her plans for the future—she wants and intends to go back to being the wonderful mother that she was. Unfortunately, her sincerity aside, the court has significant concerns as to her ability to do so. She takes little responsibility for her current situation and to a certain extent blames her family members for not being supportive enough of her.[5] She is able to articulate that she made "a big mistake." Her insight into this situation ends there. Absent a much greater appreciation of her role in the situation in which she finds herself, the court has little confidence that substantive change is on the horizon.

As stated, the petitioner has proven, by clear and convincing evidence the alleged ground for the termination of both the mother's and the father's parental rights as to all five children.

---

[5] She went so far as to suggest that if they were truly supportive, they would transport the children every day to see her while she is incarcerated. This suggestion is without any regard for the three to four hours that the children would be in a car, on a daily basis, the impact of seeing their mother in a correctional facility, and the physical and emotional drain of

## IV

## DISPOSITION

As to the dispositional phase of this hearing on the petition for termination of parental rights, the court has considered the evidence and testimony related to circumstances and events up to and including August 28, 2007, the date on which the evidence in this matter was completed. Of the issues presented, the dispositional ones are the most difficult. This family is extremely bonded. This was once a happy and healthy family. These children love their parents, and it is quite clear that the feelings are reciprocated. The twins lived with their parents, through the good times and the very bad times for twelve years, M for eight, S for four and one-half and T for the first eighteen months of his thus far brief life. The children are a close-knit group of siblings who have loved and taken care of each other. They are also extraordinarily fortunate to have had loving and capable relatives who were willing and able to step into the void created when their parents' lives spiraled out of control. These relative foster placements have allowed the children to stay together in two groups, and have continued to support each other and the ongoing contact between all five of these children.

"If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Quanitra M.*, 60 Conn. App. 96, 103, 758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909 (2000). "In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [§ 17a-112

such an arrangement on the children and her family members as well as the other impracticalities of such a demand.

(j)]." (Internal quotation marks omitted.) *In re Jonathon G.*, 63 Conn. App. 516, 528, 777 A.2d 695 (2001), quoting *In re Denzel A.*, 53 Conn. App. 827, 833, 733 A.2d 298 (1999). The seven factors "serve simply as guidelines to the court and are not statutory prerequisites that need to be proven before termination can be ordered." *In re Quanitra M.*, supra, 104. The court considers each of them in determining whether to terminate parental rights under this section. The court makes the following seven written findings:

(1) As to the timeliness, nature and extent of services offered, provided and made available to the parents and the children by an agency to facilitate the reunion of the children with the respondents, the court finds that the department offered services, including parenting education, individual counseling, visitation and substance abuse testing and counseling. The court relies on the findings previously stated regarding the mother's and father's cooperation with these offered services.

(2) As to whether the department has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended, the court finds that the department made such efforts.

(3) As to the extent to which all parties have fulfilled their obligations under the terms of any applicable court order entered into and agreed on by any individual or agency and the parent, the court finds that specific steps were ordered as to the respondent mother. As set forth previously, there was compliance by the mother and father with some steps but failure to comply with the vast majority of them.

(4) As to the feelings and emotional ties of the children with respect to the children's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for

at least one year and with whom the child has developed significant emotional ties, the court finds as follows.

All five children are bonded to their mother and their father. The older children, E, L, M and to a lesser extent S, know and love their parents. T, who was eighteen months old at the time of his removal, demonstrated a significant bond at the time of removal. It appears that this bond has weakened since then. The older children understand their parents' substance abuse issues and understand that as a result of those issues as well as their parents' incarceration, that neither parent is physically able to care for them. It is clear that the children would prefer for these issues not to exist and would like to return to their parents' home and care. For the reasons articulated previously, their hopes, while certainly important in the court's analysis, are not realistic for the near or even foreseeable future. The children also love and are bonded with their current caregivers. E, L and M love their grandparents. They feel safe and secure in their care. Similarly, S and T love and are bonded to J. They have been with her for almost eighteen months. They are comfortable and happy in her care. They seek solace from her and by all accounts continue to thrive in her care. The court is impressed and confident in the commitment of both the grandparents and J to the welfare of these five children.

The adjustment to their placements has not been without issues.

S was placed at age four and one-half. At that time, she still used a pacifier, which was lost shortly after placement and not replaced. She had difficulty with her speech, which was attributed to the prolonged use of the pacifier. She has made great progress in her speech. S also exhibited what appears to be no sense of structure to her daily life. J testified that she wanted to stay up all night and watch television and had trouble

adjusting to any routine. She also had nightmares for approximately one month. Whether these were causally connected to the removal, her life with her parents or simply the taking away of the pacifier is unknown. However, the nightmares had three recurring features: she was cold, she was hungry and her daddy was not there. She no longer has these nightmares.

T adjusted more easily to placement and appears to be thriving.

E, as indicated previously, went into placement "parentified." She had assumed responsibility for the younger children and had even devised safety and rescue plans should drug dealers break into their home. She disclosed to her grandparents that she was happy to not have to worry about many things that concerned her when the children lived with their parents. Notwithstanding the sense of relief she expressed, she has consistently held out hope that her parents would do what they needed to do to reunite the family. At visits, both E and L would interrogate their parents on whether they were getting treatment, addressing the drug issues and otherwise following the steps. The parents provided what can only be described as false assurances that they were taking care of these issues.

Although she is happy with her grandparents, E does not believe her parents' rights should be terminated. She is adamant that she does not want to be adopted. She sent her mother a letter in which she expresses her desire to testify so that she can show the judge that termination is not right. Consistent with having been parentified, E writes: "Please let me go to court. Please, I can help you. I'm not [too] young." Since placement, E has struggled in school, and her performance there has not been as good as in the past. The court presumes that the pendency of these proceedings weighs heavily on E's mind.

E's grandparents have made clear their commitment to her for as long as is needed and under whatever scenario results from these proceedings. They would like to adopt all three children for the added degree of stability it would provide. They believe that there is too much work for mom and dad to do and that to keep the prospect of upheaval open for so long is not fair to the children or in their best interest. The grandparents have also indicated that if the mother and father are sober, the grandparents will not preclude them from seeing the children.

L is also mature for her age. Though less "parentified" than her twin sister, she has had to cope with some very difficult medical issues. Prior to placement, J testified that the parents were not adequately addressing those medical needs. For example, there were times when J would take L only to discover that she had no colostomy bags or other supplies needed to maintain her in a safe and hygienic manner. L has not had to suffer this neglect in placement. Indeed, enormous efforts have been made to try to improve her medical condition and her quality of life.

Like her sister, although happy with her grandparents, L is adamant that she does not want to be adopted and that she does not want her parents' rights terminated. L has equivocated on this issue in the past but appears steadfast at this juncture. The grandparents' commitment to L is unwavering, again, under whatever legal scenario might result from these proceedings.

M has also adjusted well to placement. She does very well in school and is happy with her grandparents. She also spends a significant amount of time with J and her younger siblings. M has indicated a willingness to be adopted. She doesn't want to "go back." She loves her parents but is happy where she is living and wants to know that where she is, is permanent.

In sum, the children have adjusted very well in their relative foster placements, and the foster parents are providing the day-to-day physical, emotional, moral and educational support the children need. Finally, the foster parents are committed to the children and would like to adopt them.

(5) As to the ages of the children, the court finds that E and L are thirteen years old. M is nine. S is soon to be six and T is three. Especially, with respect to M, S and T, the children need and deserve a sense of permanency and stability as they grow bonded to their current caregivers. The uncertainty of not knowing if or when their mother or father might reemerge to assert a claim for custody of these children is of paramount importance.[6] As long as that possibility exists, these children might once again be dragged into the judicial process and placed in the nebulous state of not knowing who will take care of them. Where will home be? What will home be? Such basic concepts of home and a reliable caregiver should not be subject to the shifting sands of the parents' belated and prolonged effort at rehabilitation.

(6) As to the efforts the parents have made to adjust their circumstances, conduct or conditions to make it in the best interest of the children to return them home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or

---

[6] Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. See *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 292, 455 A.2d 1313 (1983). The Appellate Court has also noted that "[b]ecause of the psychological effects of prolonged termination proceedings on young children, *time is of the essence* . . . ." (Emphasis added.) *In re Alexander V.*, 25 Conn. App. 741, 748, 596 A.2d 934 (1991), aff'd, 223 Conn. 557, 613 A.2d 780 (1992).

communication with the guardian or other custodian of the child, the court finds as follows: the parents made little effort, as discussed previously, to adjust their circumstances in this matter so as to facilitate reunification. With respect to visitation and communication, when not incarcerated, their efforts were inconsistent and sporadic. Indeed, mother stopped any visitation without explanation in December, 2006. She had no contact with the S or T at J's home between December and March. The father's visitation, similarly, was sporadic prior to his incarceration. He requested no visitation from April through June. He attended visitation thereafter but missed several sessions prior to his incarceration in November, 2006. In fact, even after he was incarcerated, no request for visitation was made for approximately five months.

(7) As to the extent to which a parent has been prevented from maintaining a meaningful relationship with the children by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent, the court finds no unreasonable conduct by the child protection agency, foster parents or third parties. As outlined previously, the failure of this family to reunite falls squarely on the shoulders of the mother and father, who, by their poor decisions, have split this family apart. Although there has been some suggestion that the department could have done more or that the incarceration of the parents has somehow made rehabilitation impossible, the court disagrees. First, the parents have been incarcerated (and with respect to the father will continue to be incarcerated) as a result of their poor choices and criminal conduct. Second, the record is replete with evidence that neither the mother nor the father made even the barest of minimal effort to do what was necessary and expected to reunify with

their children. To the contrary, they sabotaged those efforts at every turn.

## A

## E and L

E and L are older than thirteen years of age and fully cognizant of the issues confronting their parents. They will likely reach the age of majority before their father is released from custody. Once the girls reach the age of eighteen, they can have whatever type of relationship they want with their father, whether his rights are terminated or not. They will also likely be well into their teens by the time their mother is back on her feet, assuming their mother ever gets there. They are old enough to refuse adoption and feel very strongly that they don't want the legal relationship with their parents severed. To do so, in the face of such strident opposition, in the court's view may well be devastating to the girls.[7] They are struggling in school and, hopefully, the resolution of these proceedings in this fashion will allow them to refocus their energies on the business of growing up—they can stop worrying about their parents. Additionally, whether through a transfer of guardianship or adoption, their grandparents will be there for them. In that sense, they will have stability of caregivers as well as permanency in the event that their mother is unable to successfully rehabilitate. Further, should their mother succeed in this regard, the girls will both

---

[7] The guardian ad litem for the twins testified that she believed it was in the girls' best interest to terminate the parents' rights. The basis for this opinion appears to have been the permanency and stability that would derive from adoption. Although these are laudable goals, the girls do not want to be adopted and can prevent that from happening even if the court grants the termination of parental rights over the girls' objections. The guardian ad litem also testified that she had not factored in the emotional or psychological impact of the termination of parental rights on the girls. This court has, and on balance, reaches a contrary conclusion as to what is in the best interest of E and L.

be older and mature enough to make decisions about the nature and extent of the relationship they want to have with their parents.

With respect to the best interest of the children contemplated by § 17a-112 (j) (2), by clear and convincing evidence, and based on all of the foregoing, the court finds that termination of the parental rights of the respondents to the child, E, is not in the best interest of the child.

With respect to the best interest of the children contemplated by § 17a-112 (j) (2), by clear and convincing evidence, and based on all of the foregoing, the court finds that termination of the parental rights of the respondents to the child L is not in the best interest of the child.

## B

## M, S and T

With respect to M, S and T, largely due to their ages, the situation is vastly different. M remembers enough of the good times to love her parents. She remembers enough of the bad times to want to be adopted by her grandparents. S and T have known and loved their parents for a much shorter time period. S has been with J since she was four and one-half, and T has now lived with J for longer than he lived with his parents. With respect to the father, the amount of time that might pass before he might reassert his rights would include waiting for his release from prison and, thereafter, however long it would take him to demonstrate a substantial period of sobriety, the ability to secure employment, housing, etc. To leave them unsettled for so long would be potentially devastating to these children. They have endured enough. "Children cannot wait for years for a determination that they should be returned to their natural parents [or] placed permanently in an adoptive

home . . . . The delays that are annoying and frustrating to adults . . . can permanently damage children and their families . . . ." (Internal quotation marks omitted.) *Pamela B.* v. *Ment*, 244 Conn. 296, 314, 709 A.2d 1089 (1998).

With respect to the mother, as found previously, there is little prospect that in any reasonable period of time, she will be able to parent these children or meet their needs. The children need and are entitled to stability and permanency. M has that with her grandparents. S and T have it with J.

With respect to the best interest of the children contemplated by § 17a-112 (j) (2), by clear and convincing evidence, and based on all of the foregoing, the court finds that termination of the parental rights of the respondents to the child, M, is in the best interest of the child.[8]

With respect to the best interest of the children contemplated by § 17a-112 (j) (2), by clear and convincing evidence, and based on all of the foregoing, the court finds that termination of the parental rights of the respondents to the child, S, is in the best interest of the child.

With respect to the best interest of the children contemplated by § 17a-112 (j) (2), by clear and convincing evidence, and based on all of the foregoing, the court finds that termination of the parental rights of the respondents to the child, T, is in the best interest of the child.

[8] The court is fully aware that in terminating parental rights with respect to M but not terminating with respect to the twins, in the future, these three siblings might be separated from each other if the mother successfully obtains a reinstatement of her guardianship. Although this is a troubling prospect, it is one that the court is confident will be taken into consideration by all persons as well as the court in any future proceedings.

As to M, S and T, in finding that termination of the respondents' parental rights would be in the children's best interest, the court has examined multiple relevant factors, including the children's interests in sustained growth, development, well-being, stability and continuity of their environment, their length of stay in foster care, the nature of their relationship with foster parents and biological parents, the degree of contact maintained with their biological parents and their genetic bond to their parents. See *In re Alexander C.*, 60 Conn. App. 555, 559, 760 A.2d 532 (2000); *In re Shyina B.*, 58 Conn. App. 159, 167, 752 A.2d 1139 (2000); *In re Savanna M.*, 55 Conn. App. 807, 816, 740 A.2d 484 (1999). The court has also balanced the children's intrinsic need for stability and permanency against the potential benefit of maintaining a connection with their biological parents. See *Pamela B.* v. *Ment*, supra, 244 Conn. 313–14 (child's physical and emotional well-being must be weighed against interest in preserving family integrity).

C

It is, accordingly, ORDERED that the parental rights of the respondents to M, S and T are hereby terminated. The commissioner of the department of children and families is hereby appointed the statutory parent for these three children.

With regard to the permanency plans for the children, the court hereby approves the plan of termination of parental rights and adoption as to M, S and T as being in the best interest of these children, first preference to be given to their current foster parents. To the extent not previously found, the court also finds that the department has made reasonable efforts to effectuate the permanency plans for these three children. With respect to E and L, the permanency plan is not approved. The petitioner will file within forty-five days hereof an alternative plan for E and L.

As to M, S and T, the petitioner will file, within thirty days hereof, a report as to the status of these children as required by statute and such further reports shall be timely presented to the court as required by law.

The clerk of the Probate Court with jurisdiction over any subsequent adoption of any of these children shall notify in writing the deputy chief clerk of the Superior Court for Juvenile Matters at Danbury of the date when said adoption is finalized.

Judgments may enter accordingly.